UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PHARMACY CORPORATION OF
AMERICA d/b/a PHARMERICA

v.                                                          Civil Action No. _____

CORTLAND PLACE HEALTH
CENTER, INC.

### *COMPLAINT*

Plaintiff PharMerica Corporation of America d/b/a PharMerica ("PharMerica") for its

Complaint against Defendant Cortland Place Health Center, Inc. ("Cortland") states as follows:

### <u>NATURE OF THE ACTION</u>

1.      This action arises out of Cortland's failure to pay for pharmacy-related goods and

services provided by PharMerica pursuant to two Pharmacy Services Agreements (the "PSAs")[1]

and improper transfer of operations of the skilled nursing and assisted living facility that Cortland

operated.

### <u>THE PARTIES</u>

2.      Pharmacy Corporation of America is a California corporation with its principal

place of business in Louisville, Kentucky. Thus, Pharmacy Corporation of America is a citizen of

California and Kentucky for purposes of federal diversity jurisdiction.

3.      Cortland Place Health Center, Inc. is a Rhode Island corporation with its principal

place of business in Delray Beach, Florida. Thus, for purposes of diversity jurisdiction, Cortland

Place Health Center, Inc. is a citizen of Rhode Island and Florida.

---

[1] The PSAs contain commercially sensitive and proprietary business information, including pricing information, and is therefore not attached hereto. They will be provided to the Court and Cortland upon request.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §1332 in that there is complete diversity of citizenship between PharMerica and Cortland and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      The Court has personal jurisdiction over Cortland because it is a citizen of this state.

6.      Venue is proper in this Court because Cortland is subject to this Court's personal jurisdiction and the events giving rise to this action took place in this judicial district.

## STATEMENT OF FACTS

### *The Pharmacy Services Agreements*

*The 2007 PSA*

7.      Effective February 1, 2007, PharMerica, Inc. entered into a Pharmacy Services Agreement with Cortland for PharMerica to provide pharmacy-related goods and services to the residents of the skilled nursing and assisted living facility (the "Facility")[2] operated and managed by Cortland in exchange for payment from Cortland (the "2007 PSA").[3]

8.      The 2007 PSA had an initial term that lasted until January 31, 2010, after which it automatically renewed for successive one-year periods pursuant to its express terms. 2007 PSA § 6(a).

9.      The 2007 PSA required Cortland to remit payment for the pharmacy-related goods to PharMerica within sixty (60) days of the date of each monthly statement provided by PharMerica. 2007 PSA § 4(a)(1).

---

[2] The Facility, known as Cortland Place, is located at 20 Austin Avenue, Greenville, Rhode Island 02828.
[3] Pharmacy Corporation of America, the Plaintiff in this action, succeeded into the interest of PharMerica, Inc. under the 2007 PSA via an addendum to the 2007 PSA dated November 1, 2010. A subsequent amendment to the 2007 PSA was likewise entered between Pharmacy Corporation of America (as successor in interest to PharMerica, Inc.) and Cortland effective May 1, 2012.

10.     The 2007 PSA required Cortland to provide written notice to PharMerica of any billing dispute before the payment due date, and to pay all undisputed amounts on or before the payment due date. 2007 PSA § 4(a)(4).

11.     If written notice of a billing dispute was not provided in accordance with the terms of the 2007 PSA, the monthly statement was deemed correct and Cortland was responsible for paying all charges thereon. 2007 PSA § 4(a)(6).

12.     For any undisputed charges that were not paid within the required sixty (60) days, interest accrued at the annual rate of 10%. 2007 PSA § 4(a)(8).

13.     If a party brings a lawsuit to enforce the terms and conditions of the 2007 PSA, the prevailing party is entitled to recover its costs and reasonable attorneys' fees, in addition to any other relief to which it is entitled. 2007 PSA § 16(i).

14.     The parties operated under the 2007 PSA (as amended) through July 31, 2018.

*The 2018 PSA*

15.     Effective August 1, 2018, PharMerica entered into a new PSA with Cortland, once again for PharMerica to provide pharmacy-related goods and services to the residents of the Facility operated and managed by Cortland in exchange for payment from Cortland (the "2018 PSA").

16.     The 2018 PSA had an initial term that lasted from August 1, 2018 until July 31, 2021. *See* 2018 PSA § 1.

17.     The 2018 PSA required Cortland to remit payment for the pharmacy-related goods to PharMerica within ninety (90) days of the date of each consolidated monthly statement provided by PharMerica, except in the event the 2018 PSA was being terminated. 2018 PSA § 5(D)(1).

18.     In the event Cortland disputed any of PharMerica's monthly statements, the 2018 PSA required Cortland to submit such disputes via email or the Resolution Center available on ViewMasterRx, and include specific information delineated in the 2018 PSA. 2018 PSA § 5(C)(1).

19.     The 2018 PSA further required the parties to negotiate to resolve any disputed charges. 2018 PSA § 5(C).

20.     For any undisputed charges that are not paid within the required ninety (90) days, interest accrues at the annual rate of 10%, and Cortland is responsible for paying all of PharMerica's costs to collect such charges, including reasonable attorneys' fees. 2018 PSA § 5(D)(2).

21.     The 2018 PSA allowed PharMerica to apportion any part of a payment made by Cortland against any outstanding principal or interest, at PharMerica's discretion. *Id.*

22.     Prior to any change in the Facility operator, the 2018 PSA required Cortland to give PharMerica a minimum of thirty (30) days advance notice prior to the effective date of the facility operator change, furnish a copy of the 2018 PSA to the purported new operator, and arrange for PharMerica to meet the purported new operator. Further, before any facility operator change, Cortland was required to pay all amounts outstanding under the 2018 PSA. 2018 PSA § 14.

23.     Any facility operator change not conducted in accordance with the above-referenced 2018 PSA requirements is a material breach thereof. *Id.*

24.     Under the 2007 and 2018 PSAs, Cortland submitted written orders to PharMerica for pharmacy-related goods and services for residents of the Facility.

25.     PharMerica filled those orders and delivered the ordered pharmacy-related goods and services to Cortland. Cortland received and accepted PharMerica's deliveries of those pharmacy-related goods and services.

4

26.     PharMerica submitted detailed written monthly invoices to Cortland for the pharmacy-related goods and services provided and satisfied all other conditions precedent to payment.

27.     Cortland failed to stay current on all of PharMerica's invoices as they became due and owing under the 2007 and 2018 PSAs, but made regular, partial payments, and promised to make future payments to bring the account current.

28.     PharMerica worked with Cortland to bring its outstanding balance down and continue servicing the Facility, applying Cortland's payments first to the oldest outstanding principal and interest, as allowed by the 2018 PSA. 2018 PSA § 5(D)(2).

29.     As of February 1, 2019, Cortland owed $131,127.60 in unpaid principal to PharMerica, plus costs and interest that continues to accrue pursuant to the express terms of the PSAs.

### *The Change in Control*

30.     Unbeknownst to PharMerica at the time, on October 26, 2018, Cortland entered an Operations Transfer Agreement (the "OTA") with an entity not yet formed, ostensibly named Cortland Place Rehab Center, LLC ("CP Rehab") to transfer operations of the Facility.[4]

31.     Under the OTA, when the transfer of ownership officially went through or closed ("OTA Closing Date"), Cortland and CP Rehab were to split the accounts receivable related to the Facility at that time, and Cortland would remain responsible for paying all accounts payable related to the Facility as of the OTA Closing Date .

32.     Cortland did not inform PharMerica of the OTA or Cortland's plans to transfer operations of the Facility.

---

[4] Upon information and belief, CP Rehab was formed in Delaware on October 18, 2018, and registered in Rhode Island on August 9, 2019.

33.     Unbeknownst to PharMerica at the time, on February 1, 2019, Cortland entered a Skilled Nursing Facility Management Agreement (the "Management Agreement") with Eden Cortland Management, LLC ("Eden") pursuant to which Eden would manage the operations of the Facility on Cortland's behalf in exchange for payment.

34.     Neither Cortland nor Eden informed PharMerica about the Management Agreement or its terms prior to its entry, and did not provide PharMerica with a copy of the Management Agreement.

35.     Eden and CP Rehab (together, the "New Owners") are both managed and/or controlled by Josh Gellis, a/k/a Louis Gellis ("Gellis"), amongst others.

36.     Under the Management Agreement, Cortland remained the legal operator of the Facility and retained ultimate control of and responsibility for the Facility, its assets, its Medicare provider number, and its operations. Management Agreement, ¶ 3.16, 16.3.

37.     The Management Agreement states that it does not impact or supersede any provision of the OTA, and particularly does not affect the OTA provisions establishing that Cortland and CP Rehab would split the accounts receivable on the OTA Closing Date, and that Cortland would remain responsible for paying accounts payable for the Facility as of the OTA Closing Date. *Id.,* ¶ 16.19.

38.     Upon information and belief, Cortland submitted an application for change in effective control from Cortland to CP Rehab (the "CHOW") to the Rhode Island Department of Health ("DOH") on February 1, 2019, and resubmitted the CHOW on April 3 and April 19, 2019.

39.     PharMerica was not informed of the CHOW when it was submitted nor was it given a copy of the application.

40.     Upon information and belief, Cortland simultaneously transferred effective control of operations of the Facility to the New Owners on or about February 1, 2019. PharMerica was also unaware of the effective transfer of operations and control.

41.     On July 18, 2019, the DOH approved CP Rehab's CHOW application. Once again, neither Cortland nor CP Rehab informed PharMerica of the CHOW.

42.     On December 31, 2019, the change of ownership for the Facility was reflected on the operating license for the Facility.  Therefore, the OTA Closing was December 31, 2019.

### *The 2019 PSA*

43.     Despite the Management Agreement stating that Cortland was only responsible for accounts payable up to the OTA Closing Date, and Cortland's effective transfer of control to the New Owners on February 1, 2019, Cortland nevertheless entered a new PSA with Cortland effective February 1, 2019 (the "2019 PSA") (collectively 2007 PSA, 2018 PSA, and 2019 PSA are referred to as the "PSAs") upon essentially the same substantive terms and conditions as the 2018 PSA.

44.     Unaware of the OTA, Management Agreement, or CHOW application, PharMerica entered into the new PSA with Cortland.

45.     Gellis signed the 2019 PSA on behalf of Cortland as its Controller.

46.     Following the entry of the 2019 PSA, orders for pharmacy-related goods and services for the Facility continued to be placed, and PharMerica continued to fill such orders and deliver timely and correct invoices for same.

47.     Around late September 2019 or early October 2019, PharMerica first learned that Eden had taken control of managing the Facility on Cortland's behalf.

7

48.     At this time, representatives of Eden told PharMerica that any payments issued to PharMerica starting on February 1, 2019 should be applied to invoices from February 1, 2019 forward, not the oldest past due invoice as was done before, because these post February 1, 2019 payments were being made by Eden (the "2019 Payments") as opposed to Cortland.

49.     Eden told PharMerica that any outstanding invoices issued prior to that date were the responsibility of the "former management."

50.     At this point, PharMerica was not aware of the Management Agreement or that orders and payments were made on behalf of anyone other than Cortland because Cortland was the only entity with which it ever dealt with, and the only party it had a contract with. This was the first time PharMerica suspected that a change in control may have been in process.

51.     Prompted by this new claim, PharMerica conducted diligent searches for change of ownership applications with the Rhode Island DOH and the National Provider Identifier records for any indication of a CHOW.

52.     PharMerica's searches did not reveal a CHOW in progress, and showed that Cortland remained the current owner/operator of the Facility and current holder of the license to legally operate it.

53.     PharMerica also called the Rhode Island DOH on two separate occasions and was told that no CHOW application was on file or in progress.

54.     Eventually, in October 2019, the New Owners provided PharMerica with a copy of the Management Agreement.

55.     However, because Cortland retained operational control under the Management Agreement, PharMerica still did not have reason to believe a change in control was in progress or

8

that anyone other than Cortland was incurring charges from PharMerica for which it was financially responsible.

56.    At that time, there was an outstanding balance of just under $200,000 in principal and interest for the Facility.  PharMerica knew that one or both of these entities was responsible for this debt, but without all the pertinent information and contracts at issue between them, it was unclear which entity owed what.

57.    Eden insisted that only a fraction of the total outstanding balance was their financial responsibility because they had been making regular payments since taking control on February 1, 2019.

58.    Because of the outstanding balance and claim from Eden that recent payments were misapplied to old balances, PharMerica requested additional information and documentation from Eden so it could verify what it was being told with its own figures.

59.    PharMerica and Eden, represented by Gellis, engaged in discussions to uncover the total outstanding balance for the Facility, and how much of that total was owed by Cortland versus how much was allegedly owed by Eden.

60.    In December 2019, Eden claimed that their own accounting showed an outstanding balance of $45,000 that they owed and offered to pay PharMerica the $45,000 to "clean up the old balance."

61.    PharMerica's records, however, showed an outstanding balance near $200,000 and insisted on documentation to show that a lesser amount was owed before it would entertain settling the outstanding balance for a lesser amount.

62.    Further, PharMerica still had not received any documentation or evidence that a CHOW had actually been applied for or effected. Ownership for the Facility and its operating

license remained in the name of Cortland, Eden was still just the management company, the New Owners had not provided a copy of the OTA, and the only PSA in effect (the 2019 PSA) was between PharMerica and Cortland.

63.     On January 10, 2020, and unbeknownst to PharMerica officially the operator of the Facility and not just the management company, the New Owners sent two spreadsheets to PharMerica, one that the New Owners claimed listed charges attributable to Cortland, and the second showing charges that were purportedly the New Owners' responsibility. In the email, the New Owners claimed that they were not responsible for Cortland's charges.

64.     The spreadsheets did not verify the New Owner's assertions of the outstanding balance for the Facility or establish whether Cortland or the New Owners were responsible for the balance.

65.     Throughout this period, PharMerica was told by the New Owners that all charges incurred before February 1, 2019 were the sole responsibility of Cortland, but did not and would not provide documentation proving that despite multiple requests.

66.     As a result, PharMerica had only conflicting information and no confirmation as to anything. It learned that management and ownership of the Facility had changed more than a year after the fact without its knowledge or permission, meanwhile its accounting records showed an outstanding balance around $200,000.

67.     Given the multitude of changes and fundamental lack of information and documentation, PharMerica did not know who the operator of the Facility was, who managed it, or who was responsible for paying PharMerica's invoices.

68.     In order to expedite collection of the outstanding balance in dispute, and based on New Owners' representations regarding responsibility for the debt, on March 27, 2020,

10

PharMerica sent a demand letter to Cortland for the total outstanding balance for the Facility, totaling $197,099.01, exclusive of interest and costs.

69.     In response, legal counsel for Cortland forwarded the letter to representatives for the New Owners, advising them that the bulk of the money demanded accrued during the period that Eden managed the Facility.

70.     On March 31, 2020, Gellis again claimed the New Owners did not owe the full outstanding amount, and claimed that payments made by the New Owners were not being properly credited to their balance.

71.     On April 7, 2020, Cortland's counsel, in turn, agreed to speak to Cortland about the portion owed by his client and reach out to the attorneys representing the New Owners regarding their portion, also stating that he hoped the dispute could be resolved amicably.

72.     On April 20, 2020, Cortland's counsel reiterated that the New Owners were responsible for most of the outstanding balance and that it would be reaching out to their counsel about a resolution.

73.     Counsel for PharMerica and Cortland continued to correspond throughout May 2020, with Cortland's counsel undertaking to reach a resolution as to the responsibility of the outstanding balance with counsel for the New Owners, who to that point were not responsive to Cortland's outreach.

74.     Near the end of May 2020, PharMerica was given new information that the New Owners assumed Cortland's debt pursuant to the OTA, and sought confirmation from Cortland's counsel and a copy of the OTA that apparently established such responsibility.

75.     Cortland's counsel did not provide a copy of the OTA, but instead sent PharMerica's counsel the Management Agreement, which did state that Eden was responsible for

11

paying all outstanding amounts owed from February 1, 2019 forward.  However, the Management Agreement did not address amounts owed for the time period before February 1, 2019.

76.     Meanwhile, the New Owners continued to maintain that they were not responsible for charges incurred by Cortland before February 1, 2019, insisting that PharMerica should seek to collect such charges from Cortland.

77.     As such, PharMerica continued to get conflicting information regarding the outstanding balance, but the parties were in agreement that outstanding charges before February 1, 2019 were Cortland's responsibility whereas those incurred after were the obligation of the New Owners.

78.     In August 2020, following the New Owners' repeated claim that its payments were misapplied to old balances before they took over, PharMerica reconciled all invoices/charges for the Facility and all payments made thereon.

79.     Per its normal practice and the 2019 PSA, PharMerica had been applying the 2019 Payments first to the oldest outstanding balances on the account. 2019 PSA, ¶ 5(D)(2).

80.     This had the effect of paying down balances and interest that pre-dated February 1, 2019, which the New Owners claimed was the date of the change of control, as opposed to paying for the most recent invoice.

81.     Pursuant to the August 2020 reconciliation and confirmation that all such payments were in fact from Eden/New Owners' bank accounts and not Cortland's, all payments made after February 1, 2019 were attributed to recent, post February 1, 2019 invoices, as opposed to being applied to the oldest balances first.

82.     This revealed that the bulk of the outstanding balance for the Facility pre-dated February 1, 2019. Once the payments were reapplied, it revealed that Cortland owed the bulk of the outstanding balance, with a smaller balance attributed to the New Owners.

83.     The New Owners paid their outstanding balance following the reconciliation.

84.     On August 27, 2020, PharMerica sent a new demand letter to Cortland, advising it that it owed $131,127.60 in unpaid principal.

85.     Cortland's counsel stated that Cortland would review the demand letter and an updated account reconciliation PharMerica provided, but then said it believed the outstanding balance was lower, and once again claimed that certain obligations were assumed by the New Owners pursuant to the contracts between them.

86.     Counsel for PharMerica and Cortland continued to correspond regarding the outstanding balance throughout September and October 2020, with Cortland requesting copies of all invoices and billing statements relevant to the balance. Throughout the parties' correspondence, Cortland maintained that the New Owners assumed responsibility for any outstanding balance when it took over management on February 1, 2019.

87.     PharMerica prepared and sent a confidentiality order so that it could provide Cortland with the requested invoices, billing statements, and other documents requested to demonstrate the outstanding balance.

88.     Cortland signed and returned the confidentiality order on October 28, 2020, and PharMerica provided the requested documents proving Cortland's outstanding balance.

89.     In November 2020, Cortland provided a spreadsheet with purported payments it made to PharMerica. PharMerica reconciled all payments listed on the provided spreadsheet and

verified that all payments listed on Cortland's spreadsheet were applied to Cortland's outstanding balance and accounted for.

90.     The November 2020 reconciliation with Cortland's payment records verified that that Cortland owed $131,127.60 in unpaid principal.

91.     PharMerica notified Cortland that the outstanding principal balance of $131,127.60 was accurate after the full reconciliation, and it was willing to honor its previous offer to accept full payment of the principal balance and waive the interest charges if Cortland made full payment.

92.     Cortland never responded to PharMerica's communication despite previously acknowledging an outstanding balance that it would pay, and stating it would work toward an amicable resolution of the dispute.

93.     Despite PharMerica's demands for the sums due and owing under the PSAs, and Cortland's multiple promises to pay, Cortland has failed and refused to pay for all of the pharmacy-related goods and services provided by and invoiced by PharMerica.

94.     Upon information and belief, Cortland has been reimbursed by Medicare for all or a significant portion of the goods and services provided by PharMerica and has directly or indirectly benefited from such reimbursements.

95.     Upon information and belief, Cortland and/or its members have reported or will report PharMerica's invoice charges as valid expenses to the Internal Revenue Service for the purpose of reducing the amount of adjusted gross income on which Cortland must pay taxes. As a result, Cortland and/or its members will pay or have paid lower taxes than they otherwise would have had to pay.

96.     Upon information and belief, Cortland has reported PharMerica's invoice charges as valid expenses to Medicare and/or Medicaid on Cortland's cost reports.

14

97.     In addition to breaching the PSAs by failing to pay amounts owed, Cortland materially breached the 2018 PSA by not providing PharMerica with at least thirty (30) days' written notice of the operations transfer to the New Owners or arrange for PharMerica to meet the purported New Owners. 2018 PSA § 14.

98.     Pursuant to Cortland's impermissible transfer of operations, Cortland was required to pay all amounts outstanding under the 2007 and 2018 PSAs within thirty (30) days and Cortland failed to do so.

99.     Cortland's transfer of operations to the New Owners without properly notifying PharMerica led to the misapplication of payments and caused the confusion over the outstanding balance that ultimately left PharMerica with a significant amount of unpaid accounts receivable.

100.    Cortland's failure to notify and now pay all amounts due and owing to PharMerica for the pharmacy-related goods and services Cortland ordered and PharMerica provided, has caused PharMerica to suffer pecuniary damages.

## COUNT I – BREACH OF CONTRACT

101.    PharMerica hereby incorporates by reference the allegations set forth above.

102.    The 2007 and 2018 PSAs are valid and binding agreements between Cortland and PharMerica for PharMerica to provide pharmacy goods and service to Cortland in exchange for compensation by Cortland.

103.    PharMerica performed all of its obligations under the 2007 and 2018 PSAs, including fulfilling conditions precedent to payment by Cortland.

104.    Without legal justification or excuse, Cortland materially breached the 2007 and 2018 PSAs with PharMerica by failing to pay sums due and owing for the services provided and

failing to provide PharMerica with the requisite written notice of its operations transfer to the New Owners.

105.    As a direct and proximate result of Cortland's breaches of the 2007 and 2018 PSAs, PharMerica has suffered damages, including, but not limited to, amounts due and owing for pharmacy goods and services PharMerica provided to Cortland and its residents, which Cortland has not paid. The damages PharMerica has suffered as a direct and proximate result of the breaches of the 2007 and 2018 PSAs are substantial and in excess of the jurisdictional minimum of this Court.

106.    Interest is accruing on the amounts owed by Cortland for unpaid pharmacy goods and services pursuant to the 2007 and 2018 PSAs and the law.

107.    PharMerica has incurred attorneys' fees and other costs seeking to collect amounts due to it, including in preparing and filing this action, all of which are the responsibility of Cortland pursuant to the 2007 and 2018 PSAs. PharMerica is likely to incur substantial additional attorneys' fees as this case is litigated and prepared for trial, which also shall be the responsibility of Cortland.

## COUNT II – UNJUST ENRICHMENT/CONSTRUCTIVE TRUST

108.    To the extent not otherwise inconsistent with this Count II, PharMerica hereby incorporates by reference the allegations set forth in this Complaint.

109.    In the alternative to Count I, PharMerica brings this claim for unjust enrichment/constructive trust.

110.    PharMerica conferred a benefit on Cortland by providing valuable pharmacy-related goods and services to the Facility.

111.    Cortland did not pay for those goods and services.

16

112.   PharMerica's goods and services were provided under circumstances pursuant to which Cortland knew, or reasonably should have known, that PharMerica would expect to be compensated.

113.   Cortland has knowingly and willingly received, or will receive, reimbursement by Medicare, directly or indirectly, for goods and services provided by PharMerica, and has wrongfully and intentionally withheld or will withhold such amounts from PharMerica.

114.   Consequently, Cortland has been unjustly enriched through the receipt of such goods and services and at the expense and to the detriment of PharMerica.

115.   Furthermore, Cortland had, and continues to have, a legal and fiduciary duty to immediately remit proceeds received in reimbursements from Medicare to PharMerica if they have not timely paid invoices as required by the 2007 and 2018 PSAs and/or implied contract.

116.   By withholding payment from PharMerica for pharmacy-related goods and services for which Cortland has received Medicare reimbursement, Cortland has been unjustly enriched.

117.   It is against equity and good conscience to permit Cortland to retain the Medicare reimbursements without paying for the goods and services PharMerica provided and for which those reimbursements were made.

118.   For these reasons, a constructive trust should be imposed on any and all proceeds which have been, or hereafter are, received by Cortland as reimbursement by Medicare for pharmacy goods and services provided by PharMerica.

119.   PharMerica is entitled to recover damages from Cortland in an amount to be proven at trial.

## COUNT III – PROMISSORY ESTOPPEL

120. To the extent not otherwise inconsistent with this Count III, PharMerica hereby incorporates by reference the allegations previously set forth in this Complaint.

121. In the alternative to Counts I and II, PharMerica brings this claim for promissory estoppel.

122. Cortland made clear and unambiguous promises and representations to PharMerica that it would pay PharMerica the outstanding balance owed under the 2007 and 2018 PSAs throughout the course of their relationship and again after PharMerica learned that the New Owners took control of the Facility.

123. Cortland made such promises and representations for the purpose of inducing PharMerica to provide and continue to provide pharmacy-related goods and services to the Facility and forego legal action.

124. PharMerica reasonably relied upon these representations of payment when it provided and continued to provide pharmacy-related goods and services to the Facility while the parties figured out the outstanding balance owed after the change in control.

125. As a direct and proximate result of PharMerica's justifiable reliance on Cortland's promises, PharMerica has suffered pecuniary damages in that PharMerica has not been paid for the goods and services it delivered to the Facility.

126. Injustice can be avoided only by enforcement of Cortland's representations and promises.

127. PharMerica is entitled to recover damages from Cortland in an amount to be proven at trial

18

## COUNT IV – QUANTUM MERUIT

128.    To the extent not otherwise inconsistent with this Count IV, PharMerica hereby incorporates by references the allegations previously set forth in this Complaint.

129.    In the alternative to Counts I, II, and III, PharMerica brings this claim for quantum meruit.

130.    PharMerica rendered valuable pharmacy-related goods and services to Cortland.

131.    Cortland accepted PharMerica's pharmacy-related goods and services, Cortland received those pharmacy-related goods and services, and PharMerica rendered the pharmacy-related goods and services with Cortland's knowledge and consent.

132.    Cortland accepted PharMerica's pharmacy-related goods and services under such circumstances that Cortland was reasonably notified that PharMerica expected to be paid by Cortland.

133.    Injustice can be avoided only by Cortland's payment to PharMerica for the pharmacy-related goods and services provided.

134.    PharMerica is entitled to recover damages from Cortland in an amount to be proven at trial.

## COUNT V – ACCOUNT STATED

135.    To the extent not otherwise inconsistent with this Count V, PharMerica hereby incorporates by reference the allegations previously set forth in this Complaint.

136.    In the alternative to Counts I, II, III, and IV, PharMerica brings this claim for account stated against Cortland.

19

137.     Pursuant to the 2007 and 2018 PSAs, PharMerica provided pharmacy related goods and services to Cortland, and Cortland is obligated to pay PharMerica for those pharmacy-related goods and services.

138.     PharMerica delivered detailed monthly invoices for pharmacy-related goods and services supplied by PharMerica to Cortland. Cortland received those invoices.

139.     Cortland did not object to or dispute such invoices at all, let alone within a reasonable period of time. Instead, Cortland paid some invoices and promised to make further payments on the invoices.

140.     By ordering pharmacy-related goods and services without objecting to the invoices, making partial payments, and promising to make additional payments, Cortland established a practice of settling accounts with PharMerica and accepted the agreed upon stated account in the invoices as being due and owing.

141.     Cortland, without justification, excuse, or dispute of such invoices, has not paid PharMerica all of the amounts invoiced, totaling $131,127.60, exclusive of interest and late fees.

142.     PharMerica is entitled to recover from Cortland for the stated accounts in an amount to be proven at trial.

## COUNT VI – ATTORNEYS' FEES

143.     To the extent not inconsistent with this Count VI, PharMerica hereby incorporates by reference the allegations set forth above.

144.     The 2018 PSA between PharMerica and Cortland provides for the recovery of attorneys' fees incurred by PharMerica in the collection of amounts due and owing.

145.     PharMerica has incurred attorneys' fees and other costs seeking to collect amounts due to it, including in preparing and filing this action, all of which are the responsibility of Cortland

pursuant to the 2018 PSA. PharMerica is likely to incur substantial additional attorneys' fees as this case is litigated and prepared for trial, which also shall be the responsibility of Cortland.

## PRAYER FOR RELIEF

WHEREFORE, PharMerica requests judgment against Cortland as follows:

1.  An award of compensatory damages in an amount to be proven at trial;

2.  The imposition of a constructive trust on sums received by Cortland as Medicare reimbursement for pharmaceutical products and services provided by PharMerica and not paid for by Cortland;

3.  PharMerica's costs, fees and disbursements, including reasonable attorneys' fees;

4.  Pre-judgment and post-judgment interest; and

5.  All other appropriate relief.

PHARMACY CORPORATION OF AMERICA, dba PHARMERICA
By its attorneys,

/s/ Douglas J. Emanuel
Douglas J. Emanuel (5176)
Andre S. Digou (8711)
Chace Ruttenberg & Freedman, LLP
One Park Row, Suite 300
Providence, RI 02903
Tel.: (401) 453-6400
Email: demanuel@crfllp.com

/s/ Jennifer Metzger Stinnett
Jennifer Metzger Stinnett (*pro hac vice admission anticipated*)
William H. Mazur (*pro hac vice admission anticipated*)
FULTZ MADDOX DICKENS PLC
101 South Fifth Street, 27th Floor
Louisville, Kentucky 40202
Tel: (502) 588-2000
Fax: (502) 588-2020
Email: jstinnett@fmdlegal.com
        wmazur@fmdlegal.com

Dated:  February 8, 2021